**RECORD NO. 17-7073**

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

*In The*

# United States Court of Appeals

*For The District of Columbia Circuit*

## RAYMOND MCGOVERN,

*Plaintiff – Appellant,*

**v.**

## CHRISTOPHER BROWN, Badge No. 018, in his individual and official capacities; MICHAEL GLAUBACH, in his individual and official capacities; JAMIE BARTON, in her individual and official capacities; GEORGE WASHINGTON UNIVERSITY,

*Defendants – Appellees.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

_____

### BRIEF OF APPELLANT

_____

Mara E. Verheyden-Hilliard
Carl Messineo
PARTNERSHIP FOR CIVIL JUSTICE FUND
617 Florida Avenue, N.W.
Washington, D.C. 20001
(202) 232-1180

*Counsel for Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### Parties and Amici

The following parties have appeared before the District Court:

*Appellant*: The Appellant is Raymond McGovern, who was the plaintiff in the District Court.

*Appellee*: The Appellees are Christopher Brown, Badge No. 018, in his individual and official capacities; Michael Glaubach, in his individual and official capacities; Jamie Barton, in her individual and official capacities; and George Washington University.

*Amici*: None to date.

### Rulings Under Review

At issue in this appeal is the March 28, 2017, Order and Memorandum Opinion by the Honorable Beryl A. Howell granting summary judgment to Appellee and denying summary judgment to Appellant published at *McGovern v. George Washington Univ.,* 245 F. Supp. 3d 167 (D.D.C. 2017).

### Related Cases

This case has not previously been before this Court. There are no pending related cases.

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................iv

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................1

PERTINENT STATUTORY PROVISIONS .............................................2

STATEMENT OF THE CASE ................................................................3

STATEMENT OF FACTS ...................................................................6

STANDARD OF REVIEW ...............................................................21

SUMMARY OF ARGUMENT ............................................................21

ARGUMENT ...............................................................................24

    I.    The Court Erred in Granting Summary Judgment in Favor of
        Defendants........................................................................24

        A.    The Court Properly Ruled that Brown and Glaubach
            Were Acting Under Color of Law .............................................24

        B.    The Court Erred in Finding that No Reasonable Jury
            Could Find that the Officers Lacked Probable Cause to
            Arrest the Plaintiff..................................................................25

            a.    The Burden of Proof to Establish Legality of the
                Arrest Falls Upon Defendants ........................................26

            b.    The Officers Did Not Possess Probable Cause to
                Arrest Mcgovern for Unlawful Entry – Refusal to
                Quit as the Prerequisites for the Offense Were Not
                Satisfied and the Offense Had Not Ripened.................27

i.    The Court erred in eliminating the
      mandatory requirement of an express
      directive to leave, and further finding that in
      the absence of an express directive, officers
      could reasonably impute to McGovern
      knowledge that such directive had issued ............32

ii    An express directive to leave did not issue ..........36

iii.  Officer Brown did not identify himself
      visually or verbally as an officer or
      otherwise as a person in charge ...........................40

iv.   Officers Brown and Glaubach did not afford
      McGovern opportunity to comply with any
      directive .................................................................44

v.    The court erred in evaluating the facts
      known to Brown and which would lead a
      reasonable officer to know he did not have
      probable cause for the arrest ................................45

C.    The Court Erred in finding that No Reasonable Jury
      Could Determine the Force Used was Objectively
      Unreasonable ...........................................................................49

II.   Issues Raised Below Left to be Addressed on Remand .....................55

A.    GWU's Liability for the Arrest ................................................55

B.    Other Uncharged Offenses .......................................................55

C.    Qualified Immunity ..................................................................56

CONCLUSION ...........................................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..................................................................25

*Barham v Ramsey,*
    434 F.3d 565 (D.C. Cir. 2006)..................................................48

*Beck v. Ohio,*
    379 U.S. 89 (1964)...................................................................26

*Defenders of Wildlife v. Gutierrez,*
    532 F.3d 913 (D.C. Cir. 2008)..................................................21

*Dellums v. Powell,*
    566 F.2d 167 (D.C. Cir. 1997)..................................................26

*Devenpeck v. Alford,*
    543 U.S. 146, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004) ......................31, 46

*District of Columbia v. Murphy*,
    631 A.2d 34 (D.C. 1993) ..........................................................30

*Graham v. O'Connor,*
    490 U.S. 386, 396 (1989) .........................................................49

*Hall v District of Columbia*,
    867 F.3d 138 (D.C. Cir. 2017)..............................................21, 50

*Maniaci v. Georgetown University*,
    510 F. Supp. 2d 50 (D.D.C. 2007)............................................24

*Michigan v. Chesternut,*
    486 U.S. 567 (1988)...........................................................27, 47

*Michigan v. DeFillippo*,
443 U.S. 31 (1979)................................................................27

*Ne. Hosp. Corp. v. Sebelius,*
657 F.3d 1 (D.C. Cir. 2011)..................................................21

*O'Brien v. United States*,
444 A.2d 946 (D.C. 1982) .................................28, 32, 33, 38, 39

*Ortberg v. United States*,
81 A.3d 303 (D.C. 2013) ................................................32, 33

*Robinson v. Pezzat,*
818 F.3d 1 ( D.C. Cir. 2016)............................................21, 26

*Rogala v. District of Columbia,*
151 F.3d 44 (D.C. Cir. 1998)................................................49

*Ronkin v. Vihn,*
71 F. Supp. 3d 124 (D.D.C. 2014)..........................................38

*Saidi v. United States*,
110 A.3d 606 (D.C. 2015) ..............................................30-31

*Scott v. Harris*,
550 U.S. 372 (2007)............................................................54

*Scott v. United States*,
436 U.S. 128 (1978)............................................................47

*Tolan v. Cotton*,
134 S. Ct. 1861 (2014)........................................................26

*United States v. Broadie*,
452 F.3d 875 (D.C. Cir. 2006)..............................................46

*United States v. Classic*,
313 U.S. 299 (1941)............................................................24

*United States v. Lewis*,
    921 F.2d 1294 (D.C. Cir. 1990) ............................................................... 39, 40

*United States v. McDougald*,
    350 A.2d 375 (D.C. 1976) ............................................................................ 24

*Wardlaw v. Pickett*,
    1 F.3d 1297 (D.C. Cir. 1993) ...................................................................... 49

*Wesby v. District of Columbia*,
    765 F.3d 13 (D.C. Cir. 2014) ........................................................... 26, 27, 47

*West v. Atkins*,
    487 U.S. 42 (1988) ...................................................................................... 24

*Whren v. United States*,
    517 U.S. 806 (1996) .................................................................................... 47

## <u>STATUTES</u>

28 U.S.C. § 1291 ................................................................................................. 1

28 U.S.C. § 1331 ................................................................................................. 1

28 U.S.C. § 1343(3) ............................................................................................ 1

28 U.S.C. § 1343(4) ............................................................................................ 1

42 U.S.C. § 1983 ............................................................................................... 24

D.C. Code § 22-1321(B) ............................................................................... 7, 16

D.C. Code § 22-3302(a)(1) ....................................................1, 2, 3, 27, 29

D.C. Code § 23-582(a) .............................................................................24

## **RULES**

Fed. R. Civ. P. 56(a)...............................................................................21

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) and (4). This is an appeal from the District Court's Memorandum and Order, dated March 28, 2017, disposing of all parties' claims. JA 606. Appellants filed a timely notice of appeal on April 26, 2017. JA 641. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.   Whether the district court erred in finding that no reasonable jury could find that the officers lacked probable cause for arrest for the uncharged offense of unlawful entry – refusal to quit under D.C. Code § 22-3302(a)(1).

2.   Whether the words, "Sir, can you please come with me," constitute a directive to quit the premises under the circumstances present, including where there is no verbal or visual presentation of authority and where the officer speaking was not attempting to lay the predicate for an unlawful entry offense.

3.   Whether the court erred in ruling that under the District of Columbia's unlawful entry – refusal to quit statute the element of an express directive to leave is not required and that such directive may be implied rather than express.

1

4.    Whether the court erred in finding that officers could impute knowledge of a directive to quit to plaintiff in the absence of an express directive, including based on a determination that his act of silent dissent was "different" than the behavior of others.

5.    Whether the court made factual and credibility determinations that are within the province of the jury, where the evidence presented demonstrates material facts in dispute.

6.    Whether the court erred in finding that no reasonable jury could determine that the force used was objectively unreasonable.

## PERTINENT STATUTORY PROVISIONS

Unlawful entry on property

D.C. Code § 22-3302(a)(1), at the time of arrest,[1] provided as follows:

Any person who, without lawful authority, shall enter, or attempt to enter, any private dwelling, building, or other property, or part of such dwelling, building, or other property, against the will of the lawful occupant or of the person lawfully in charge thereof, or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant, or of the person lawfully in charge thereof, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not more than $1,000, imprisonment for not more than 180 days, or both. The presence of a person in any private dwelling, building, or other property that is otherwise vacant and boarded-up or otherwise secured in a manner that conveys that it is vacant and not to be entered,

---

[1] The current provision is substantively identical. However, a 2013 amendment substituted the words "not more than the amount set forth in § 22-3571.01" for "not more than $1,000." *See* D.C. Code § 22-3302(a)(1)(2014 edition).

2

or displays a no trespassing sign, shall be prima facie evidence that any person found in such property has entered against the will of the person in legal possession of the property.

D.C. Code §22-3302(a)(1) (2010 edition)

## STATEMENT OF THE CASE

This case stems from the arrest of Raymond McGovern when he engaged in a silent, peaceful expression of dissent during a speech by a political official at George Washington University (GWU) by standing and turning his back to the speaker. In events that unfolded in a matter of mere seconds, McGovern, then 71, was seized, removed from the auditorium and left bloodied and with contusions over his body.

The court determined that no constitutional violations had been committed: that the defendants had probable cause to arrest for the uncharged offense of unlawful entry and that no reasonable jury could conclude that the force used was excessive. The court made multiple factual determinations that plaintiff asserts are within the province of the jury and further asserts that there are disputed facts where inferences properly drawn in plaintiff's favor would preclude summary judgment against him.

McGovern was perceived as a "silent insult" to the speaker by GWU police officials and they acted to remove him pursuant to internal "zero tolerance" policies. GWU Special Police Officers (SPOs) were trained that they were

3

authorized to seize persons who violated policy in the absence of a criminal offense, in derogation of municipal law. They were further trained that they could extend arrest authority for disorderly conduct offenses to arrest for policy offenses that do not meet the standards of disorderly conduct under municipal law.

As such, while the University possesses, as all private entities, the ability to divest itself of unwanted guests by application of the offense of unlawful entry – refusal to quit, the officers in this matter were not seeking to lay the predicate for an unlawful entry – refusal to quit offense, believing that McGovern could be seized without an express directive to quit, and without meaningful opportunity to comply with any express directive.

This case raises a significant issue and new, variant interpretation of the District of Columbia's unlawful entry statute. Specifically, at issue is the question of what standards must be met to establish the mandatory prerequisite of an order to quit; i.e., an express demand to leave the premises by a person conveying authority to issue such demand. Without the order to quit, there can be no offense for refusal to quit upon lawful demand to leave the premises.

The express directive to leave is an indispensable element of the offense of unlawful entry - refusal to quit provision, along with and followed by the refusal to comply with such express directive. Unlawful entry – entry against the will does not require a directive to leave as it involves unlawful entry ab initio.

4

The district court eliminated this requirement of an express directive to leave, and found that instead, "under District of Columbia law, the 'will' of a lawful occupant [may be] objectively manifest through either express or implied means," thus negating the obligation and mandatory prerequisite that there be a specific, express directive to leave as previously articulated by the D.C. Court of Appeals.

The court thus misapplied the D.C. Court of Appeals finding in Ortberg regarding the unlawful entry offense for entering against the will of an occupant, to the refusal to quit offense. These are different offenses and are distinct in their application and requirements.

This case has raised raises important questions of law regarding a private university's use and training of its police officers to extend municipal arrest and seizure authority beyond that authorized under municipal law for the purposes of enforcing internal university policy, including whether the District's disorderly conduct law – disruption of public gatherings, may be used to arrest persons at private events and gatherings, other than funerals and religious services.

It additionally raises significant questions as to the availability of qualified immunity for security officers of a private entity who are commissioned as SPOs under municipal law and whose responsibilities are to enforce private, internal policy.

However, after determining that the GWU officers were acting under color of law, the court determined that no constitutional violations had been committed and did not reach the issues of qualified immunity or the extension of the disorderly conduct ordinance for use at private gatherings.

Thus, although additional significant issues are raised in this matter below, the matters before this Court are review of the District Court's ruling on unlawful entry and excessive force.

### STATEMENT OF FACTS

Raymond L. McGovern served as an analyst with the Central Intelligence Agency for 27 years, wrote for the President's daily brief under Presidents Richard M. Nixon and Gerald R. Ford, and personally briefed that publication to Vice President George H. W. Bush and other senior officials in the administration of Ronald W. Reagan. Though retired, as a peace advocate he has continued interests in foreign policy. JA 12, 250.

George Washington University (GWU) is a congressionally chartered corporation and private university. JA 16, 37. GWU employs Special Police Officers (SPOs) who, as a primary function, are charged with enforcing the internal policies of GWU. JA 275.

On February 15, 2011, McGovern, then 71 years old, was arrested by GWU police officers and charged with the offense of "Disorderly Conduct – Disruption of a Gathering or Congregation," D.C. Code § 22-1321(B). JA 11, 41.

McGovern suffered physical injuries, including being bloodied, bruised and lacerated by the excessive force of officers Brown and Glaubach. JA 572-589 (photographs reflecting bruising and lacerations all over his body). McGovern testified that he was bleeding badly, could feel the blood on his clothes, sought medical help and was treated at the scene by EMS technicians. JA 82, 84.

According to GWU's official public statement on the arrest issued February 16, 2011, McGovern "was arrested by the [GWPD] and was charged with disorderly conduct after violating the university's demonstration policy during a speech by U.S. Secretary of State Hillary Rodham Clinton on campus." JA 276.

McGovern was issued a ticket from GWU (JA 18, 40) in McGovern's name at his email address, for attendance at the event on February 15, 2011 at GWU's Jack Morton Auditorium (JA 427-430, 521-522) at which then Secretary of State Hillary Clinton was making an official State Department policy announcement related to free speech on the Internet in other countries. JA 175, 487A McGovern was registered to attend in his own name in advance by GWU Professor Col. Lawrence Wilkerson (JA 75) for the ticketed event.

A rigorous security perimeter, including magnetometer scans, as well as searches of personal possessions such as laptops, was enforced by GWU and law enforcement officers and all ticketed/registered guests, including McGovern, were so screened before passing into the auditorium. JA 248-250, 431-433.

McGovern selected a seat in the curved auditorium. JA 434. As Secretary Clinton entered the stage and was received by sustained standing applause, Mr. McGovern was moved to engage in an act of silent dissent as an expression of his antiwar political views in opposition to Secretary Clinton's record and policies regarding the Middle East. JA 4.

While standing along with the other audience members who were standing and applauding, he turned his back on Secretary Clinton. McGovern, a U.S. Army veteran, wore a t-shirt that said "Veterans for Peace." As others sat down after applauding, McGovern remained in his standing position with his back turned and he faced the rear of the auditorium, silently. JA 253-258. McGovern's acted to bear silent witness in peaceful nonviolent dissent. JA 4, 258.

At the time of the events the GWU Chief of Police was Kevin Hay. JA 279. Chief Hay possessed "final policy-making authority" to issue and approve GWU Police Department policy. JA 280. Hay was commissioned by the District of Columbia as a SPO. JA 280.

Chief Hay was in the auditorium. Chief Hay testified that he observed McGovern standing silently and in Hay's opinion "[b]y choosing to stand with his back to the Secretary of State, it was a silent insult to her by wearing his Veterans for Peace T-shirt, essentially a protest sign." JA 289.

Secretary Clinton began speaking without any delay or interruption. JA 175, 487A (C-Span, CNN, PBS videos).

As McGovern stood in silent dissent, the cameras filming the speech were not obstructed by McGovern and continued to broadcast Secretary Clinton's speech without interruption or even visibility of McGovern at that time. JA 175, 487A (C-Span, CNN, PBS videos).

Chief Hay left the auditorium and he testified that he "grabbed" GWUPD Corporal Christopher S. Brown, supervisor for the detail involving the Clinton event (JA 303, 317) and GWUPD Captain Michael Glaubach, who was Brown's supervisor (JA 376 – 377) and informed them that there was an individual standing up and causing a "disruption" (JA 379-380) by standing with his back turned towards Secretary Clinton. Brown testified that Hay "advised us that there was an individual standing with his back towards Hillary Clinton." JA 318.

Captain Glaubach testified that he understood that he was to "address the disruption." JA 381.

9

Both Brown and Glaubach were commissioned by the District of Columbia as SPOs. JA 315, 372. Glaubach was the official who drafted and created the GWU disorderly conduct training materials, which including GWPD Policy Notes appended to the text of the District's disorderly conduct law, given to GW officers for internal training for disorderly conduct arrests. JA 450.

Secretary Clinton's speech continued unimpeded and undisrupted by McGovern's silent expression. JA 175, 487A (C-Span, CNN, PBS videos). Brown noted that Secretary Clinton's speech did not stop. Glaubach did not perceive that McGovern was "making any sounds." JA 382.

There was no complaint from anyone abut McGovern's silent standing. Chief Hay testified that there were none about McGovern either before or after the event, including that there were no complaints from the media at any time. JA 298. Brown testified that there were no complaints that McGovern was obstructing anyone's view either from the audience or the media. JA 322, 343, 344, 349.

Brown and Glaubach made a decision to arrest McGovern. JA 310 – 311, 356, 404-405. They did so in furtherance of GW's "zero tolerance" policy which dictated the removal of McGovern, by force if necessary, once he had stood up and turned his back. JA 98-99, 110-111.

GWU's zero tolerance policy directed officers that they were privileged to seize persons even where those persons had not committed a criminal offense.

10

Chief Hay testified that according to GWU policy, a person did not have to be subject to arrest for a criminal offense at the point that GWU police officers were authorized to seize that person. JA 287–288.

Brown and Glaubach effected the physical arrest of McGovern. JA 404-405. Captain Glaubach, did not wear a uniform and chose instead to dress in civilian plain clothes, specifically a suit. JA 393-394.  Glaubach testified that a "uniform is a more overt display of authority. It's more immediately recognizable." JA 378.

Glaubach stood in the aisle directly adjacent to the row which Mr. McGovern was in. JA 175 (Hatchet video), 178-185, 386. Glaubach wore a badge around his neck, however that badge was not clearly visible at all times, as is reflected in still images at the time of the incident showing that the badge was not always visible, particularly as he stood in the aisle prior to turning his body towards McGovern after Brown's seizure. JA 178-185.

McGovern, whose gaze was visibly fixed straight to the back wall, testified he became peripherally aware that "a very large man in a dark business suit [came] down the [center] aisle within my peripheral vision towards me," JA 261. McGovern testified, "The large man in the civilian suit was menacing. But there was no indication that he had anything to do with law enforcement that I saw.") JA 269-270.

11

Glaubach testified that he and Brown were in the auditorium "for 12 seconds maybe" before removing McGovern. JA 118.

Corporal Brown, who was in uniform, entered the row approaching from the side and the rear and stood behind McGovern. JA 175 (Hatchet), 324, 384,

Brown did not stand and address McGovern in a manner to be visible face to face or otherwise in front of him; JA 175 (Hatchet). He did not move within the row to be visible in front of Mr. McGovern but took up a position behind him. Both Brown and Glaubach admit in deposition that Brown stood "slightly behind" McGovern, (JA 324, 384) who attests he did not see Brown (JA 263, 265). Video evidence shows Brown standing behind Mr. McGovern. JA 175 (Hatchet).

The next events also occurred very quickly and in a matter of seconds. JA 118, 175 (Hatchet), 298, 386, 392, 401.

Brown, in quick succession, twice said "Sir, can you please come with me." JA 386. He said no other words to McGovern. JA 330. He then immediately seized McGovern. JA 331-337.

Choosing not to stand in front of McGovern or otherwise within his field of vision, Brown did not identify himself verbally or visually as a police officer or otherwise as a person speaking on behalf of GWU.

Glaubach testified that Brown spoke to McGovern over "[a] couple of seconds" and touched McGovern's arm for [l]ess than a second" (JA 388-389)

12

before use of force against McGovern. The Hatchet video (JA 175) begins at the point that Brown touched McGovern's arm while speaking to him and depicts this portion of the encounter (visually, as Brown cannot be heard on the video).

Brown issued no order, demand or directive to take any action, including specifically no order, demand or directive to quit the premises or leave the property. Similarly, Brown issued no statement indicating or conveying that McGovern's ticket or license to be present was revoked. Glaubach attests he said nothing to McGovern while in the auditorium. JA 392.

Chief Hay testified that the words Brown issued, "Sir, can you please come with me," constituted words of "verbal encouraging." JA 286.

Brown testified that he chose to not raise his voice even after McGovern did not respond to the first words spoken and that he was cautious to not be loud. JA 327-329. Brown himself cannot say whether his words were audible to any nearby person or surrounding audience member. JA 330.

McGovern, then age 71 and a visibly older man with gray hair, did not hear Brown. JA 265.

Glaubach, standing "between 6 and 8 feet away" in a silenced room but for Secretary Clinton's voice, did not hear Brown either. JA 386-387. By all accounts, including Hay and the responding officers, McGovern did not respond or indicate awareness of Brown's presence or words. JA 325. In these very few seconds of

13

attempted communication, Brown observed "no response" or acknowledgement at all. JA 305.

Brown did not allow for more than a second for response to his words. Immediately upon the end of stating to McGovern, "Sir, can you please come with me," twice in quick succession, Brown escalated to use of physical force, sharply seizing McGovern from his position behind McGovern in the row of chairs and pulling McGovern down towards Brown's waist and out towards the center aisle over and into adjacent seated audience members in that row. JA 487A.

Brown testified that he "took control of Mr. McGovern" through use of force by "placing him an escort position and escorting him out the [row]" (JA 325-326) and clarified that the word "escort" is the same as "pull" (JA 335). Brown testified that "I physically grabbed Mr. McGovern and pulled him down to my waist to escort him out." JA 331.

According to Brown, from the time he seized McGovern in the row, he was under police control and not free to leave. JA 336. Brown testified that McGovern was not "free to walk away" from police custody "from the time [Brown] put [his] hands on McGovern in the row" (JA 336) including that McGovern was under police control whey they went through the auditorium doorway into the lobby (JA 337).

14

McGovern testified that when he was "seized from behind" (JA 265) "I was about to fall on those folks [others in the same row]" (JA 267).

McGovern testified that "I was then put in a choke hold, dragged out of the auditorium" including by [t]he person from behind that I never saw." JA 265.

Standing in the aisle as Brown seized McGovern, Glaubach immediately reached into the row to grab McGovern and pulled him by the head and neck. Glaubach testified that he sought to impose pain on Mr. McGovern through a tactic against the hypoglossal nerve in Mr. McGovern's neck.  JA 89, 92.

Mr. McGovern testified that, "Two very large men had me in a head lock." JA 268.

With McGovern in the aisle, Brown remained behind McGovern as he and Glaubach, in plain clothes, forced McGovern up the aisle. JA 487A (Hatchet, CNN, PBS).

McGovern, aware that a man in ordinary clothes was, along with another unseen man behind him had extinguished his peaceful act of dissent and were contorting him and pulling him up the aisle, cried out to them "So this is America? This is America?" "Who are you?" "I was just standing silently" and You're breaking my arm!" JA 175 (Hatchet). McGovern testified "I didn't know who the person was. The one person I could see [plainclothed Glaubach], I had no idea who he was. That's why you hear me crying on the way out, "Who are you?" He never

15

identified himself. And I didn't know until I got out of the building that the other person [Brown] had a police uniform on."   JA 268.

As Glaubach and Brown aggressively removed McGovern from the auditorium, Chief Hay held open one of the double doors to the auditorium and the other was held open by another person. Glaubach and Brown gratuitously slammed McGovern into the door on the left.  JA 175 (Hatchet).

The first time officers identified themselves to McGovern was after they reached the lobby outside the auditorium. "We moved him into the lobby away from the doors to the auditorium . . . He was informed of who we were. So Corporal Brown and I both identified ourselves; Chief Hay identified himself. We informed him that he was under arrest and we ordered him to place his hands in a position to be handcuffed. . ." JA 394-396.

McGovern was arrested and charged with the offense of "disorderly conduct – disruption of a gathering or congregation" under D.C. Code § 22-1321(b).  JA 20, 41.

Brown and Glaubach conferred and made the decision that Officer Barton would be identified as the arresting officer on paperwork, although she was not present in the auditorium and arrived later at the scene. JA 345-346.

Barton arrived after McGovern was in custody and was informed by Glaubach that McGovern had been disorderly. JA 421-422.  Barton testified, in

16

contradiction to Brown and Glaubach, that she was ordered by Glaubach to take

the arrest of McGovern and that she objected to being identified as the arresting

officer because she had not witnessed the alleged disorderly conduct violation (as

is required under District law). She objected to multiple officers on the scene and

was told to "shut up and do [your] job." JA 422-423   Brown testified that Barton

volunteered to take the arrest and that he was not concerned that she had not

witnessed the underlying offense. JA 346-347. Glaubach also testified that Barton

volunteered and was not ordered to be the arresting officer. JA 121.

Barton placed McGovern under arrest for disorderly conduct, disrupting [a]

gathering or congregation, and participated in handcuffing McGovern, searched

him, transported him to the MPD station, and signed and filed the arrest report. JA

127-128.

When Barton took McGovern to the Metropolitan Police Second District for

booking, Barton sought to have MPD Officer Richard Kennedy (who was never at

the scene, he was on duty at the station) swear out an affidavit attesting to the

underlying facts and serve as the arresting officer. JA 590. Kennedy, however,

refused, stating "[T]his isn't my arrest. I wasn't there. I'm not getting jammed up

in this [expletive omitted] for you. I'm not going to be responsible when you

[expletive omitted] this up because you don't know what you're doing. I'm not

putting my name on anything." JA 590.

17

Brown testified at his September 2, 2015 deposition, four and one half years after the arrest at issue, that there was no probable cause basis to charge McGovern with any criminal offense other than disorderly conduct. JA 341.

Brown testified that, as per GWU training, he was following the GWU Policy Notes on disorderly conduct when he conducted the arrest and seizure of Mr. McGovern. JA 362-364.

According to Brown, he was acting pursuant to GWU policy by seizing McGovern and pulling him up the aisle, and when McGovern cried out "This is America!" that is when his conduct constituted disorderly conduct. JA 355-359.

GWU maintains internal policies issued by authority of the GWUPD Chief titled "Demonstrations Policy" and "Disruption of University Functions." JA 132-137, 139-141.

According to Officer Brown, he was enforcing these two GWU policies and their zero tolerance measures when he used force and seized McGovern. JA 353, 355-356, 358-360.

The conduct deemed to constitute "disruption" for which there is zero tolerance under GWU policy varies from "event to event" according to Captain Glaubach. JA 406-407. In part, what is deemed "disruptive" and thus subject to seizure and force, depends on what the event organizer or speaker conveys, or is presumed to want to allow, according to GWUPD Assistant Chief Frank Demes.

18

Demes testified, "[I]f we have Cornel West here at GW or somebody that controversial and they intentionally say Hey, I want people, I want feedback, I want heated arguments, it's okay." JA 370.

There is no description or definition that is published to the public as to what constitutes disruptive conduct, thus no way to know event by event whether certain peaceful conduct will constitute a violation and be subject to seizure by GWUPD SPOs. JA 406-407.

On or about January 21, 2011, the District of Columbia Metropolitan Police Department over the signature of Chief Cathy L. Lanier published a MPD Circular CIR-11-01, titled "Disorderly Conduct." JA 439-449. ("As of February 1, 2011, no member of the Metropolitan Police Department shall make or approve an arrest for disorderly conduct" without reviewing the Circular and in addition "all members shall complete" required disorderly conduct training before February 8, 2011).

In advance of the effective date of new Disorderly Conduct law changes, GWU published GWUPD training materials, "Disorderly Conduct Amendment Act of 2010 / MPD Training Circular CIR-11-01 Effective on February 1, 2011." The GWUPD training materials reproduce verbatim the text of MPD CIR-11-1. JA 450-487. However, GW also appended additional "GWPD Policy Notes" as part of the training materials for its SPOs in enforcement of the municipal disorderly

conduct law. JA 485-487.  The training materials, including the GWPD Policy Notes, were created and drafted by Glaubach. JA 300-301, 411-415.

Glaubach had the authority to draft and issue police training material without upper level review, but as a matter of practice he included the Police Chief's approval before issuance. JA 374-375, 414. Chief Hay gave his approval, within his authority as final policy maker for the GWU police, for the Disorderly Conduct Training Materials, including the GWPD Policy Notes on disorderly conduct. JA 301-302.

According to Chief Hay, the Policy Notes on disorderly conduct are "a way of letting the officers know how a certain law might be used by us, given our private university status, our private property, how we did things as a university police department, as SPOs." JA 300-301.  Hay affirmed it is "a way of training the officers on how to use the disorderly conduct law in furtherance of GWU policy." JA 300-301.

The GWPD specifically directs and trains GW's SPOs that they are authorized to use the District of Columbia criminal offense of disorderly conduct – disruption of a public gathering to arrest persons who have, in GWU's event-by-event view, violated GWU's internal policies at its private gatherings and events. JA 487.

20

## STANDARD OF REVIEW

The district court's summary judgment ruling is reviewed de novo, "apply[ing] the same standard of review applicable to the underlying claims in the district court." *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 918 (D.C. Cir. 2008). A party is entitled to summary judgment where, "viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor," *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 4 (D.C. Cir. 2011), this Court determines that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court is to examine "the facts in the record and all reasonable inferences derived therefrom in a light most favorable" *McGovern. Hall v. District of Columbia*, 867 F.3d 138, 146 (D.C. Cir 2017) (quoting *Robinson v. Pezzat*, 818 F.3d 1, 7-8 (D.C. Cir. 2016).

## SUMMARY OF ARGUMENT

The court erred in granting summary judgment to defendants, finding that probable cause existed for the uncharged offense of unlawful entry – refusal to quit, and that no reasonable jury could find otherwise. The court also improperly determined that no reasonable jury could find that the force used was excessive.

21

The court made multiple factual determinations that are within the province of the jury and failed to view the facts in a light most favorable to plaintiff and draw inferences in his favor.

The officers arresting McGovern acted to remove him pursuant to internal "zero tolerance" policies and their training that they were authorized to seize persons in the absence of a criminal offense, in derogation of municipal law. They were further trained that they could extend arrest authority for disorderly conduct offenses to arrest for policy offenses that do not meet the standards of disorderly conduct under municipal law.

While GWU possessed the ability to divest itself of unwanted guests by application of the unlawful entry – refusal to quit offense, the officers in this matter who seized McGovern did not avail themselves of that process, were not seeking to lay the predicate for that offense and did not do so, believing that McGovern could be seized without an express directive to quit, and without meaningful opportunity to comply with any express directive.

The court erred by eliminating the requirement that an express directive to leave be issued, finding instead that the directive could be implied rather than express, a position that has never been articulated by the D.C. Court of Appeals in the context of the refusal to quit offense.

22

An express directive to quit did not issue, nor did officer Brown identify himself visually or verbally as an officer or a person in charge. Brown admitted in testimony that he did not have probable cause to arrest for the uncharged offense of unlawful entry – refusal to quit. The court erred in dismissing this admission as a matter of subjective intent, however it is relevant because it evidences, along with other testimony, the facts known to him and the reality that he was never seeking to satisfy the requirements of issuing a directive to leave for an unlawful entry – refusal to quit offense to ripen, and thus did not do so.

The court erred in finding that in the absence of an express directive to leave, knowledge of the intention of such directive could be imputed to plaintiff by the officers including based on the fact that he was engaged in an act of dissent such that he was behaving "differently" than others and should thus understand that he was directed to leave the premises even where not so told.

The court erred in its evaluation of the excessive force used against plaintiff, and the application of Graham factors. In addition to making factual findings where material facts are in dispute, the court erred in finding that a high-profile speaker necessarily conferred on McGovern the status of a security threat.  He was registered in advance and entered through a rigorous security perimeter with ID check and magnetometer searches. His act was standing silently with his back turned towards the speaker wearing a Veterans for Peace T-shirt, and the GWPD

23

Chief of Police himself stated that his concern was that McGovern posed a "silent insult" to the speaker.

## ARGUMENT

## I.    The Court Erred in Granting Summary Judgment in Favor of Defendants

### A.    The Court Properly Ruled that Brown and Glaubach Were Acting Under Color of Law

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

In order to commit an act under color of law, an individual must be "clothed with the authority of state law." *Maniaci v. Georgetown University*, 510 F. Supp. 2d 50, 69 (D.D.C. 2007) (citing *United States v. Classic*, 313 U.S. 299, 326 (1941)).

Brown and Glaubach were commissioned as SPOs under District of Columbia law. D.C. Code § 23-582(a); *United States v. McDougald*, 350 A.2d 375, 378 (D.C. 1976) ("[t]he power of arrest of a special policeman is the sole factor which distinguishes the holder of a special police commission from a private citizen.").

24

The court correctly ruled that Corporal Brown and Captain Glaubach, acted under color of state law when they approached, removed and arrested the plaintiff, and that even if the seizure of McGovern had not culminated in a formal arrest, their actions constituted state action. JA 621-625.

**B.     The Court Erred in Finding that No Reasonable Jury Could Find that the Officers Lacked Probable Cause to Arrest the Plaintiff**

The lower court erred and departed from established law regarding the unlawful entry – refusal to quit offense. It found, in an expansion not previously articulated by the D.C. Court of Appeals, that an express directive to leave is not required and that such directive, may be implied. The court extended a Court of Appeals ruling regarding requirements of the unlawful entry – entry against the will provision to the different offense of unlawful entry – refusal to quit. The court additionally erred in ruling that in the absence of an express order to quit - directive to leave, officers could reasonable impute to plaintiff knowledge that such directive had issued.

The court substituted its own determination as to facts in dispute and failed to draw all justifiable inferences from the evidence in favor of the non-moving party in its adjudication of Appellees' Motion for Summary Judgment. See *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

The district court "neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of

the nonmoving party." *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014). It

"improperly assumed the 'jury functions' of making '[c]redibility determinations,

... weighing ... the evidence, and ... drawing ... legitimate inferences from the

facts.'" *Robinson v. Pezzat*, 818 F.3d 1, 3–4 (D.C. Cir. 2016) (citing *Anderson*, 477

U.S. at 255).

### a. The Burden of Proof to Establish Legality of the Arrest Falls Upon Defendants

"[A]n allegation of arrest and imprisonment without warrant shifts to the

defendant the burden of justifying the arrest. . ." *Dellums v. Powell*, 566 F.2d 167,

175-76 (D.C. Cir. 1997) (providing detailed analysis of burdens of proof and

persuasion in false arrest claims in order "to aid later analysis" by the courts).

In the instant case, that Mr. McGovern was arrested without warrant is not

disputed. Thus, the unlawfulness of his subsequent and admitted arrest and

imprisonment is presumed.

The assessment of probable cause is an objective one. An arrest is supported

by probable cause if, "at the moment the arrest was made, ... the facts and

circumstances within [the arresting officers'] knowledge and of which they had

reasonably trustworthy information were sufficient to warrant a prudent man in

believing" that the suspect has committed or is committing a crime. *Wesby v.*

*District of Columbia*, 765 F.3d 13, 19 (D.C. Cir. 2014) (quoting *Beck v. Ohio*, 379

U.S. 89, 91 (1964)).

26

To determine whether police had probable cause to believe that a plaintiff was violating District of Columbia law, the court looks to District law to identify the elements of each of those offenses. *Wesby*, 765 F.3d at 19 (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)).

No reasonable officer could have concluded that there was probable cause to believe McGovern had committed a crime at the moment of his arrest, when he was seized by Brown in the row in which he was standing silently.

  **b. The Officers Did Not Possess Probable Cause to Arrest Mcgovern for Unlawful Entry – Refusal to Quit as the Prerequisites for the Offense Were Not Satisfied and the Offense Had Not Ripened**

The lower court erred in holding that there was probable cause for the uncharged offense of unlawful entry – refusal to quit, pursuant to D.C. Code § 22-3302(a)(1).

Unlawful entry may be established by a refusal to quit if the initial entry was authorized. It is undisputed McGovern entered upon the private property of GWU as a registered and ticketed guest of GWU.

The prerequisite for probable cause on an unlawful entry - refusal to quit offense was not satisfied where Corporal Brown did not issue the necessary demand to quit the premises and did not visually or verbally present his authority or otherwise identify himself to Mr. McGovern at the time that the offense is

alleged to have ripened. See *O'Brien v. United States*, 444 A.2d 946, 948 (D.C. 1982) (finding that for the statutory requirement to be satisfied "that a person lawfully in charge of the premises expressly order the party to leave").

Brown was not attempting to issue a directive to leave and did not do so as he believed he was following University policy that authorized seizures of persons who violate the University's internal disruption policies even where the conduct would not be considered unlawful under D.C. law. The University trains and authorizes officers to seize a person without probable cause to believe the person has committed a criminal offense. Further, Brown believed pursuant to training, that GWUs SPOs were additionally privileged to arrest for disorderly conduct based on violations of the University's disruption policies even where that same conduct is not considered unlawful under the District of Columbia's disorderly conduct law.

The unlawful training and misuse of SPO authority is significant here, on GWU's private property, where the SPOs incorrectly believed that they could seize a person without a warning to the potential arrestee, either pursuant to GW's disruption policy absent a criminal offense, or pursuant to its misapplication of disorderly conduct law to its own definition of disorderly or disruptive conduct. This lack of warning is distinctive from the private property offense of unlawful

entry – refusal to quit, which requires an express directive to leave the premises, opportunity to comply and refusal, for the existence of probable cause to arrest.

In this instance, Brown did not have probable cause to arrest McGovern for unlawful entry because he had not, knew he had not – and was not seeking to – lay the predicate for that arrest, specifically a directive to leave followed by opportunity to comply and refusal.

Brown approached McGovern in the row in which McGovern was standing facing away from the stage and coming from the side and behind, assumed a position behind and to the side McGovern rather than within McGovern's field of vision. Brown stated twice, in quick succession, in an unraised voice, "Sir, can you please come with me[?]." JA 386. Then he immediately seized McGovern. JA 331-337.

D.C. Code § 22-3302(a)(1), at the time of arrest,[2] provided that unlawful entry may be established by an unlawful entry ab initio, against the will of the property owner, or by a refusal to quit the premises upon the demand and order of an authorized agent. Because McGovern entered upon the private property of GWU as a registered and ticketed guest of GWU probable cause for his arrest for unlawful entry is analyzed under the refusal to quit provision.

---

[2] The current provision is substantively identical.

29

Where the offense of unlawful entry is based on a refusal to quit premises

and remain on the property[3], the essential elements of the offense require:

> 1. That the defendant was present in a public or private dwelling, building or other property . . .
> **2. That the defendant was directed to leave the property by the lawful occupant or person lawfully in charge of the property;**
> 3. That at the time s/he was directed to leave the property, the defendant was without lawful authority to remain there; and
> **4. That upon being directed to leave the property, the defendant refused to leave.**

> *District of Columbia v. Murphy*, 631 A.2d 34, 37 n.6 (D.C. 1993) (citing Criminal Jury Instructions for the District of Columbia) (emphasis added).

Municipal law affords the private property owner adequate recourse to

divest guests or invitees of a lawful right to be present on another's property under

the unlawful entry statute. See *Saidi v. United States*, 110 A.3d 606, 611-12 (D.C.

---

[3] At the court below, Appellees also argued that they had probable cause to arrest for unlawful entry without requiring a directive to leave, inaccurately asserting without any factual basis that the terms of the invitation to the event were conditioned on a requirement to remain seated. Therefore, officers claimed authority to arrest without an order to quit. The district court dismissed this assertion as "dubious," given that attendees were not given notice of any such alleged policy. JA 631. Appellees even went so far as to represent to the court that the invitation "was a presentation and a 'seated event,'" and as the court pointed out, "While the defendants' use of quotation marks suggests that the phrase 'seated event' appears somewhere on the invitation cited as support for the defendants' averment, no such phrase is used on that document." JA 608. The court's dismissal of this argument is not in dispute here, nor is the court's finding that Appellees Brown and Glaubach acted under color of state law.

2015) (adopting violation of the unlawful entry provision as defining when a person becomes a trespasser).

In this case, GWU did not avail itself of that process. Corporal Brown himself does not contend probable cause existed to arrest for unlawful entry.

While the "subjective intent of the arresting officer" is "no basis for invalidating an arrest. Those are lawfully arrested whom the **facts known to the arresting officer** give probable cause to arrest*." Devenpeck v. Alford*, 543 U.S. 146, 154–55, 125 S. Ct. 588, 594, 160 L. Ed. 2d 537 (2004) (emphasis added).

In other words, while an officer's subjective state of mind is not relevant to a probable cause inquiry, the facts in his possession are. Brown's admission that he did not have probable cause to arrest for unlawful entry – refusal to quit, goes to the facts known to him as an arresting officer.

This offense requires the interactions and specific acts of two parties, in this case one of whom was Brown. It requires a predicate act, a directive to leave by a person lawfully in charge, followed by the failure to quit by the person arrested for the offense. Any officer possessing the facts in Brown's possession, knowing that he had not met –as he was not attempting to meet - the unlawful entry prerequisites, would know that he did not have probable cause to arrest for that offense.

31

At the summary judgment phase the court was required to view the facts in the light most favorable to the non-movant. At a minimum this is a material factual issue in dispute that should be resolved by a jury.

> **i.    The Court erred in eliminating the mandatory requirement of an express directive to leave, and further finding that in the absence of an express directive, officers could reasonably impute to McGovern knowledge that such directive had issued**

For the offense of unlawful entry – refusal to quit, the D.C. Court of Appeals has required an express directive to leave. See *O'Brien*, 444 A.2d at 948 (finding the statutory requirement is satisfied "that a person lawfully in charge of the premises expressly order[s] the party to leave.")

The district court eliminated this requirement of an express directive to leave, and found that instead, "under District of Columbia law, the 'will' of a lawful occupant [may be] objectively manifest through either express or implied means," thus negating the obligation and mandatory prerequisite that there be a specific, express directive to leave as previously articulated by the D.C. Court of Appeals. JA 631, 633 (citing *Ortberg v. United States*, 81 A.3d 303, 308 (D.C. 2013) (holding with regard to the unlawful entry – entry against the will provision of the statute)).

The express directive to leave is an indispensable element of the offense of unlawful entry - refusal to quit provision, along with and followed by the refusal to

comply with such express directive. Unlawful entry – entry against the will does not require a directive to leave as it involves unlawful entry ab initio.

The district court ruling found that officers could impute to Mr. McGovern knowledge that he had been ordered to leave the premises by a person lawfully in charge, and thus an intentional refusal to leave, based on circumstances other than an express directive to leave. The court, citing *Ortberg*, found that, "under District of Columbia law, the will of the lawful occupant need only be 'objectively manifest' through 'express or implied' means." JA 631, 633

The court thus misapplied the D.C. Court of Appeals finding in *Ortberg* of the unlawful entry offense, in which it addressed entering against the will of the lawful occupant, to the refusal to quit offense. These are different offenses and elements and are distinct in their application and requirements. O'Brien, articulates that for the statutory requirement under unlawful entry – refusal to quit to be satisfied "that a person lawfully in charge of the premises **expressly order[s] the party to leave**." *O'Brien*, 444 A.2d at 948 (emphasis added).

It is a significant departure from existing law, the requirements of the District of Columbia criminal code, and due process, to suggest that these crucial elements of the offense may be generally inferred or imputed from circumstances other than the fact of an express issuance of an order to quit followed by the refusal to do so.

33

A directive to leave cannot be inferred or implied, it must be express. In eliminating this requirement, the court ruled in stark contrast to the plain language of the offense and the D.C. Court of Appeals requirements of the elements of the offense. Should this Court be inclined to affirm this departure, McGovern has moved that this question of District of Columbia law be certified to the D.C. Court of Appeals. See Appellant's Motion to Certify Question of Law filed July, 17, 2017.

The court, however, found that no reasonable jury could find that the officers lacked probable cause to arrest McGovern, because even in the absence of an express directive to leave, the "officer could have reasonably believed that the plaintiff was aware that he was acting in a manner different from every other person in the auditorium and, to avoid further disruption, was being required to leave by persons [sic] with lawful authority to order him to do so; and was refusing to comply with the officers' [sic] lawful request." JA 634.[4]

This ruling, in error, asserts that even where an officer fails to meet the basic requirements necessary for an unlawful entry offense to ripen, he is privileged to conduct an arrest assuming that a person would generally be aware that their

---

[4] The court also made an incorrect finding of fact that McGovern was being required to leave by multiple "persons" with authority and refusing to comply with multiple "officers" requests.   It is uncontroverted that only one officer spoke to McGovern.  JA 392.

conduct was "different" and should assume that that "different" conduct would naturally cause them to be directed to leave the premises. This is a new interpretation of the District of Columbia's unlawful entry law – refusal to quit.

As a general matter, to allow arrest and deprivation of liberty based on anything less than violations as codified where specific requirements are spelled out for an offense to occur risks basic due process rights and will allow for discretionary and arbitrary enforcement as well as depriving the public of understandable knowledge as to what conduct will be deemed unlawful.

Moreover, allowing unlawful entry arrests without an express directive to quit and refusal to do so, instead inferring an implied directive based on assumptions about social conventions or preferred behavior poses a significant threat to free speech activities. The very definition of dissent is expression that is "different" from the majority or the powerful. In the absence of clear guidelines and requirements prior to the deprivation of liberty the risk of censorship is high. An invitee who "speaks truth to power" in any setting where unlawful entry offenses may attach, including Congressional offices, cannot be subject to arrest without warning solely because the dissenter's speech is "different" than the lobbyist's.

### ii.     An express directive to leave did not issue

A lawful order to quit, as that term is defined by the local unlawful entry law, is not constituted by the words "Sir, can you please come with me[?]" spoken from behind without display or communication of authority by the person speaking.

It is not even marginally difficult to articulate an order to leave, using any number of formulations that leave no question that a person is being told to quit the premises, to get out. Adhering to this simple, and easily met, requirement places no burden on a property owner. Plaintiff does not contend that there are "magic words." One can quickly construct any number of clear directives: "You are ordered to leave the premises." "Leave this property now," "Get out of my house."

One can similarly contemplate any number of additional examples, showing the infirmity of the words, "Sir, can you please come with me," as a purported directive to quit:  A person behaving inappropriately in a house of worship, asked by a person in charge, "Sir, can you please come with me;" a person leafletting inside a metro station being asked by WMATA police, "Sir can you please come with me;" a moviegoer talking too loud on their cell phone asked by an usher, "Sir, can you please come with me;" a hostess confronting a now unwelcome and belligerent guest in her home, "Can you please come with me." None of these communications are sufficient notice that a person has been ordered to leave a

36

property such that probable cause could exist to arrest for unlawful entry - failure to quit, with nothing further communicated. Indeed, as in the case at bar, they reasonably indicate perhaps a desire for the person to move to another location in the room or the premises, to accompany and engage further with the person who is inquiring – but not a directive to get out of the premises.

The words "Sir, can you please come with me[?]" do not constitute a demand much less do they constitute a directive to leave the premises.

Literally, Brown's words are a polite inquiry as to capability, i.e., whether McGovern is able or willing to come with the unidentified speaker. Colloquially, the words at best convey a suggestion. GWUPD Chief Hay attested such words constitute "verbal encouraging." JA 286.

As words of encouragement or suggestion, they cannot be deemed to constitute a demand. The context, stating such words in an admittedly unraised voice does not suggest a demand or directive.

Under these circumstances, no demand to leave the premises has been articulated.

Even if one interprets these words most generously as constituting a directive, this begs the question of a directive to do what? They were not an express directive, pursuant to the unlawful entry statute, to leave or quit the premises.

37

Corporal Brown could easily have specifically directed McGovern to leave premises, the auditorium or GWU, but he did not. Instead, he said to McGovern in a normal tone of voice, "Sir, can you please come with me[?]" to an unknown destination, perhaps to another location in the auditorium, perhaps to the side to speak further or ask questions of him, or even to have him carry out his silent protest in a different corner of the auditorium.

A reasonable officer, even believing that some directive had been given, could not have believed that there had been a failure to comply with a request to quit or leave the premises and that probable cause existed to arrest for a refusal to quit in violation of the unlawful entry statute. See e.g., *Ronkin v. Vihn*, 71 F. Supp. 3d 124, 133-34 (D.D.C. 2014), (finding the legal threshold met where person who entered property with permission was thereafter directed to "catch a cab and go home," "leave" and "don't come through the station [i.e., the property]."

*O'Brien*, articulates that for the statutory requirement to be satisfied "that a person lawfully in charge of the premises **expressly order[s] the party to leave.**" *O'Brien*, 444 A.2d at 948 (emphasis added). In *O'Brien*, a regulation proscribed distribution of handbills in a given location. An officer advised plaintiff of that lawful regulation and told him he was free to distribute his literature a few feet away on other public space to which the prohibition did not apply. Plaintiff refused to cease his activities and "advised the officer to either arrest him or leave him

38

alone." *O'Brien*, 444 A.2d at 947. A second officer then advised plaintiff of the same prohibition and, after plaintiff refused to leave, that officer arrested plaintiff. Id. In the case at bar, Brown did not, as O'Brien requires, "expressly order [McGovern] to leave" GWU's property.

The argument that Brown's words constituted a directive to quit, or that an express directive may be replaced with an implied one, must be rejected, especially in the context of police-civilian interactions where courts are in many circumstances called upon to determine, and indeed constitutional consequences flow from, whether words spoken by police constitute a suggestion or request for consensual cooperation as distinguished from a demand or order that requires compliance. See e.g. *United States v. Lewis*, 921 F.2d 1294 (D.C. Cir. 1990) (police requested what lower court found to be a "patently offensive" public body search of bus traveler, which was deemed by appellate court to be consensual and therefore not in violation of the Fourth Amendment). There would be far-reaching consequences were words such as "Sir, can I search you [or your home]?" deemed orders and not requests for voluntary compliance or "verbal encouragement."

While GWU could have directed McGovern to leave and it would not have been burdensome to do so, Brown did not do so.

### iii.   Officer Brown did not identify himself visually or verbally as an officer or otherwise as a person in charge

Brown's words were also not buttressed by a show of police authority from Brown. To the extent that his words of "verbal encouragement" (JA 286) are considered as possessing more of a directive quality because they were issued by an officer (But see *Lewis*, 921 F.2d 1294) Brown did not present himself visually or verbally to McGovern as an officer, although he easily could have.

He did not identify himself as an officer or agent of GWU to McGovern verbally in his communications, and he chose to speak to McGovern positioned behind, to the rear of McGovern, rather than moving into his line of sight. He chose to present McGovern, at best, with an unidentified disembodied voice asking him, "Sir, can you please come with me[?]"

Even the context, stating such words in an admittedly unraised voice do not convey a demand or directive. See JA 327-329 (Brown admits he was cautious to not be loud and did not raise his voice even after McGovern failed to response to the first inquiry).

In finding that "no reasonable jury could find a lack of probable cause to arrest the plaintiff for the offense of unlawful entry," (JA 635) the court erred in making a number of factual determinations that are either in dispute or unsupported in the record.

Regarding the visibility of Brown and Glaubachs' status as police officers, the court found, "At the time they seized the plaintiff, Corporal Brown and Captain Glaubach knew… that Captain Glaubach who was dressed in a suit and wearing a GWPD badge, could readily be seen by the plaintiff; that Corporal Brown, who was dressed in a police uniform, had made physical contact and asked the plaintiff at least twice to 'come with' him…"  JA 633-634. The effective show of police authority is a disputed material fact.

The Court further added a footnote calling into question the plaintiff's credibility and stating that he had expressed concern when he had "see[n] Captain Glaubach approaching him," (JA 634) which suggests that McGovern was aware of the law enforcement identity and authority of the man he acknowledged peripherally seeing in the aisle.

To the contrary, McGovern testified that he did not know Glaubach was a law enforcement officer ("The large man in the civilian suit was menacing. But there was no indication that he had anything to do with law enforcement that I saw." JA 269-270), there is factual dispute as to whether Glaubach's badge was "readily seen," or his authority apparent, given his decision not to wear a uniform and his knowledge of those facts (Glaubach testified a "uniform is a more overt display of authority. It's more immediately recognizable." JA 378; video images show the lack of badge visibility) and McGovern testified that he did not see

41

Brown or an officer in uniform. Brown did not stand in front of McGovern or ensure the visibility of his uniform, though he easily could have.

McGovern testified that he peripherally saw a large-sized man in civilian clothes approach his direction in the aisle menacingly in presumed response to McGovern's standing silently. That man was not then identified as "Glaubach" or as law enforcement to McGovern.[5]

That man in civilian dress remained in the aisle as McGovern was swiftly grabbed from behind by a different person he could not see and who did not verbally identify himself as an officer or otherwise. The court disregarded the fact that Brown approached McGovern in the aisle from behind and, as evidenced in video, forced McGovern up the center aisle from behind him.  Both officers knew and admitted that Brown was standing and speaking from behind McGovern. They also know that the entire incident inside the auditorium from approach to seizure to removal took place in mere seconds.

The court dismissed McGovern's excited utterance at the time he was seized in which he shouted, "Who are you?" which indicated to both officers that he did not know their identity/authority to remove him. The court made the factual and

---

[5] Indeed, D.C. municipal regulations require SPOs to wear a uniform to be visually identifiable as officers when they carry out the powers granted to SPOs, but Glaubach secured a waiver on the basis that he often works on administrative tasks instead and, apparently, a uniform would be an inconvenience for him.

42

credibility determination, "Yet, the plaintiff did so only after first shouting 'So this is America. This is America!,' suggesting he was aware he was being removed from the auditorium on account of his standing demonstration …Consequently, neither the plaintiff's actions nor his words during this removal from the auditorium negated the existence of probable cause for the offense of unlawful entry" JA 635.

The fact that McGovern might understand that his sudden removal was a consequence of his silent dissent – and that he would object to that as a deviation from his sense of American values - has no bearing on knowledge as to who was removing him. Any person who opposed his political expression might have been removing him, regardless of whether they possessed lawful authority to order him to leave or to physically remove him. Indeed, at political events held by other political figures, it has not been unknown for audience members to take matters into their own hands in the presence of dissent.

A reasonable officer could not assume that a person's distress at being seized while expressing silent, peaceful dissent confers knowledge that he has been directed to leave by a person in lawfully in charge.

The court also erred in finding that Brown's touching McGovern's shoulder briefly before he grabbed McGovern, or his grabbing McGovern's arm in the milliseconds at the start of his forceful take down, where he "made physical

43

contact" (JA 634) could be construed to have communicated a lawful directive to leave.

Putting aside that such touch from an unidentified hand could have been an audience member moving past him, or any audience member for any purpose, it cannot constitute lawful notice of anything for the purposes of a criminal offense and coupled with the words, "Sir, can you please come with me," still fails to convey an express directive to quit.

### iv.    Officers Brown and Glaubach did not afford McGovern opportunity to comply with any directive

Inherent in the statutory requirement of a refusal to quit is the opportunity to comply with a directive. The police did not afford McGovern time within which to comply, even if they assumed he had been issued and heard an order. Brown did not afford McGovern a reasonable opportunity to comply, had he in fact issued a directive to leave that had been heard.

Only seconds elapsed between the initiation of attempted communication and the escalation to use of force. JA 118, 298, 386, 388-389, 392, 401.

Only a second or so passed from the last word being issued from behind Mr. McGovern and the officer's escalation to seizure through use of substantial force which presents a genuine issue as to whether Mr. McGovern refused or was afforded reasonable opportunity to comply with an order to quit, had a demand to leave, in fact, been issued. While there is no set amount of time required for

44

opportunity to comply with a demand – had one issued – there must be a reasonable opportunity to comply.

Moreover, the lack of opportunity to comply again relates back to the fact that Brown was not actually giving an order to quit and setting the predicate for an unlawful entry arrest. Rather he was, as he testified, seeking to enforce university policy which he believed allowed him to seize persons for violating a non-published and varying "zero tolerance" rule on disruption. Chief of Police Hay confirmed in testimony that officers were privileged to seize persons asserted to be in violation of university policy regardless of whether they had committed a criminal offense under municipal law. The University trained its personnel that the District's disorderly conduct law could be extended to the university's policies on disruption – even where those policies go beyond the lawful constraints of the District of Columbia code as to what constitutes a disruption, and further where the disorderly conduct law applies to public gatherings, rather than private events.

> **v.** **The court erred in evaluating the facts known to Brown and which would lead a reasonable officer to know he did not have probable cause for the arrest**

The court also erred in failing to properly evaluate Corporal Brown's admission that he did not have probable cause to arrest for unlawful entry - refusal to quit JA 632. This is relevant not as a matter of subjective intent, but because it evidences the facts known to him and the reality that he was never seeking to

satisfy the requirement of issuing a directive to leave. This is why the words he stated did not constitute an order to quit the premises.

With regard to unlawful entry, a lawful process available to private property owners, even Corporal Brown himself does not suggest there was probable cause to arrest for this offence. He was not invoking those processes when he approached McGovern from behind, did not direct him to leave the premises, as required under the unlawful entry law, and instead, within seconds, escalated to commanding force to seize custody and control of McGovern

In his September, 2015, deposition, four years after the arrest, Brown candidly does <u>not</u> assert there was a violation of the unlawful entry statute or that he or anyone had probable cause to arrest for unlawful entry. JA 341.

An officer's subjective reason for making an arrest, or the actual charged offense, is not the exclusive basis on which an arrest may be justified. An arrest is valid so long as, on the facts of which the officers were aware, an objective observer can discern probable cause. See *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *United States v. Broadie*, 452 F.3d 875, 881 (D.C. Cir. 2006).

Brown attests in deposition that the only probable cause basis that existed for the arrest of Mr. McGovern is disorderly conduct. JA 341

In Fourth Amendment analysis, courts generally do not look to the actual subjective motivations of the officers, but to the objective qualities of the

46

encounter. See e.g., *Whren v. United States*, 517 U.S. 806, 812-13 (1996); See also *Michigan v. Chesternut*, 486 U.S. 567, 575 n.7 (1988) ("[T]he subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that intent has been conveyed to the person confronted."); *Scott v. United States*, 436 U.S. 128, 138 (1978) (Court examines officers' actions and not state of mind).

Brown was not seeking, and did not seek, to satisfy the prerequisites for the offense and was not attempting to issue an order to leave the premises because he inaccurately believed he was authorized to seize persons pursuant to university policy and for violating university policy, regardless of whether there was an arrestable offence (which would authorize seizure) under municipal law. He also believed he could arrest for disorderly conduct for violation of private GWU policy rather than the exacting standards as set forth under D.C. law. As such, he correctly understood that "at the moment the arrest was made … the facts and circumstances" within Brown's knowledge were insufficient to warrant a prudent man believing that Mr. McGovern had committed the crime of unlawful entry – refusal to quit. See *Wesby v. District of Columbia*, 765 F.3d 13, 20 (D.C. Cir. 2014) (citation omitted).

47

Brown knew he did not have probable cause to arrest for unlawful entry and had not laid the groundwork for that arrest, and any reasonable officer with this knowledge and perspective would have known that as well.

Thus, at the time that Corporal Brown seized Mr. McGovern with force, he did not have a reasonable basis to believe that the plaintiff was committing the offense of unlawful entry – refusal to quit. See *Barham v Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006)(finding that an officer must have "enough information to warrant a man of reasonable caution" to believe that all elements of a crime are present to have probable cause to arrest).

Corporal Brown knew he did not display his authority to McGovern, knew he did not even attempt to convey his authority verbally, and he knew the words he uttered in an unraised voice were specifically, "Sir, can you please come with me[?]" Because those words do not constitute a demand, much less the necessary specific demand to leave the premises – and because Brown did not attempt to construct such a demand -  the offense of unlawful entry - refusal to quit had not ripened.

As Corporal Brown quickly escalated to a seizure and use of force without presenting such a demand, an otherwise clear and simple intervention became an unlawful arrest with an unprivileged and excessive use of force.

48

**C.    The Court Erred in Finding that No Reasonable Jury Could Determine the Force Used was Objectively Unreasonable**

The physical force that was used against McGovern was unreasonably excessive. In determining whether use of force was reasonable (in the context of a lawful arrest), courts consider the severity of the crime at issue, whether the plaintiff was actively resisting arrest, and whether the plaintiff posed an immediate threat to the officer's or other's safety. *Graham v. O'Connor*, 490 U.S. 386, 396 (1989). The severity of the injury plaintiff suffered is also relevant. *Wardlaw v. Pickett*, 1 F.3d 1297, 1304 n.7 (D.C. Cir. 1993).

The district court in its ruling summarily dismissed the Graham factors addressed by McGovern (JA 638) with factual determinations that did not view the disputed facts in the light most favorable to the plaintiff and it drew its inferences in favor of the moving party.

McGovern was not arrested for a violent crime, but for silent standing, what the Chief of the GWU Police identified as a "silent insult" to a public official and alleged violation of the decorum sought by a private university in her respect. JA 289.

McGovern was left bloodied, bruised and lacerated by Brown and Glaubach, requiring treatment by EMTs to stanch the bleeding. JA 82, 84, 572-589.

While "not every push or shove" violates the Fourth Amendment, *Rogala v. District of Columbia,* 151 F.3d 44, 55 (D.C. Cir. 1998), plaintiff draws attention

49

not only to the totality of the force used but to the particularly gratuitous slamming of his body into the doorjam right in front of Chief Hay as the officers marched McGovern out of the auditorium.

There was no evidence that McGovern posed a security threat or that he had committed a serious crime. See *Hall v District of Columbia*, 867 F.3d 138, 157 (D.C. Cir. 2017) (factors in excessive force evaluation).

The court suggested that a factor justifying the amount of force used against McGovern was that the speaker to whom the Plaintiff had turned his back and stood silently was the Secretary of State. JA 638. Yet, the high-profile nature of the speaker alone does not provide basis for a reasonable officer to believe that McGovern was violent, dangerous or possibly armed.

There is no record evidence that the 71-year-old McGovern, who had been pre-registered and identified, screened by magnetometer and was standing peacefully with his back turned, not even facing the Secretary or making any movement whatsoever, and was wearing a political t-shirt that said "Veterans for Peace," either posed or was viewed by the SPOs as constituting a threat to physical safety.

Chief of Police Hay did consider that this was a high-profile event and that the act of peaceful dissent was perceived as an embarrassment to the proceedings

50

and to the honor of the Secretary, a high-profile public official. However, what he referred to as a "silent insult" cannot be equated with a security risk. JA 289.

The high profile nature of a speaker alone cannot be the barometer by which those in his or her presence are considered security threats, such that force is privileged to be used against them. Nor can an act of peaceful and nonthreatening dissent without more be the basis for considering someone a security threat. High profile persons, and notably government officials, are more likely than others to attract persons seeking to engage free speech and petitioning of their government. In circumstances as are present here, where those present have been subject to extensive screening, expressions of peaceful dissent alone cannot be used as a profile marker of a security threat.

The Court made factual determinations that plaintiff was resisting law enforcement officers (JA 638) although McGovern asserted, and the video does not contradict, that when he was suddenly seized from behind and yanked to the side, he was immediately yanked into and over occupied audience chairs in the row, forcing him to try to maintain his balance rather than fall on people. This was evident to the seizing officers and a reasonable officer would have so perceived.

McGovern could not have been resisting a law enforcement officer when the officers failed to show or state their authority and he was seized from behind. Again, the visibility of the officers is a matter of disputed fact.

51

Once having determined that probable cause for an unlawful entry arrest existed based on a ruling that officers could reasonably infer that McGovern knew he was being directed to leave without an express order and that he was thus refusing an order, despite one not being expressly given, the court then made factual and credibility findings that McGovern's conduct and statements showed resistance, and therefore a refusal to quit. The court stated that, "[t]he parties do not dispute, as the video footage reveals, that Corporal Brown expended some effort in getting the plaintiff from where he was seated to the aisle, and that the plaintiff reached down to grab the arms of seats he passed [reference omitted] Although the plaintiff asserts that in that moment he may simply have been trying to 'get [his] balance' because he 'was about to fall on … folks' seated between him and the aisle [reference omitted] the defendants allege he was actively trying to resist the officers [reference omitted]. JA 634

This factual finding regarding McGovern's conduct, despite contrary evidence, also affected the court's excessive force evaluation.  The court stated, "As explained above, the seizure at issue in this case was supported by probable cause that the plaintiff was refusing to quit the private property evidenced the plaintiff's objectively apparent resistance of the authority of the SPOs. Accordingly, the defendants were entitled to use some force."  The court went on

52

to state that "the plaintiff resisted the officers' physical contact while being removed from the auditorium." JA 638.

When Brown grabbed McGovern and pulled him suddenly downwards and out in the direction of the aisle, against and into persons seated in fixed audience chairs McGovern sought to steady himself to keep from falling. This would have been readily observable to any reasonable officer, that yanking someone down and into a narrow row of persons sitting in fixed seats would cause a person to stumble or fall and reflexively need to steady themselves.

Within a second or two of Brown's seizure, Mr. McGovern was seized by the head and neck before he reached the aisle by Captain Glaubach who implemented pain measures and began pulling McGovern by the head and then contorting him into a painful headlock. Mr. McGovern's response to being brutalized and contorted cannot be adjudicated by the court necessarily, or properly perceived by the officers, as resistance, notably also while he was calling out "You are breaking my arm!" and "Who are you?"

Even GWU's policy on use of force prohibits "contact controls," defined as "the level where the officer first places their hands on the subject," except where there is resistance to "the officer's **commands**." JA 156-157 (emphasis added). The use of physical force or compliance controls or contact was unreasonable in the absence of the failure to show authority or make an audible command directive

53

to McGovern. The continued use of force was unreasonable when McGovern clearly was asking "Who are you?" which reinforced the officers' knowledge of their failure to show authority.

A reasonable jury could determine that the force used was excessive.

It is a matter of disputed fact as to whether officers intentionally/gratuitously rammed McGovern into a door as they removed him. The court made a factual determination that no reasonable jury could determine that the officers' slamming of Mr. McGovern into the door was objectively unreasonable and did so referencing the Hatchet video, however the Hatchet video does not "blatantly contradict" or "utterly discredit" Mr. McGovern's version of events in this regard, nor inferences drawn in his favor, and only shows a partial obscured angle of that event which even still supports McGovern's contention. See *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The video does not contradict Mr. McGovern's version of the facts, which must be credited as the non-movant, and where the video leaves open questions of fact that require inferences be drawn, those inferences must also be drawn in favor of Mr. McGovern. The facts that Mr. McGovern attests to are relevant in viewing the situation from the perspective of a reasonable officer

## II.     Issues Raised Below Left to be Addressed on Remand

Having made a determination that McGovern suffered no violation of his constitutional rights, and that there was probable cause for his arrest, the court did not address multiple issues that while significant, need not be addressed by this court in the first instance but are appropriately addressed on remand.

### A.     GWU's Liability for the Arrest

Once determining that there was no constitutional violation suffered by McGovern, the court determined that GW could not be held liable and thus did not, as it did not need to, address plaintiff's arguments as to bases for liability in detail. Plaintiff put forth two bases for liability: 1) the issuance of unlawful policies that caused McGovern's false arrest, and 2) through the on-scene participation, approval and ratification of its final policymaking officials.

### B.     Other Uncharged Offenses

In the District Court, McGovern challenged that there was probable cause for his arrest for the offense of disorderly conduct and the uncharged offense of assault on a police officer. Finding probable cause for arrest for the offense of unlawful entry –refusal to quit, the court stated that it need not address these issues. J.A. 635. On remand the district court would be permitted to address those questions. Before the district court, plaintiff demonstrated that there was no

55

probable cause for either offense (Dkt Nos. 43, 49) but those matters are not before this court for review.

### C.    Qualified Immunity

The court also did not rule on whether the individual defendants could invoke qualified immunity as they are SPOs employed by a private entity enforcing private university policy. Finding that the issue "is a question of significant importance," the court stated that its holding that the SPOs "committed no constitutional violation, obviat[ed] the need to resolve this issue here." JA 628. "Consequently, whether, and under what circumstances, SPOs may invoke the defense of qualified immunity remains an issue left to another case." JA 628.  This too, would be appropriately addressed by the district court on remand.

### CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the District Court and remand for further proceedings.

Respectfully Submitted,

 /s/Mara E. Verheyden-Hilliard
Mara E. Verheyden-Hilliard
Carl Messineo
PARTNERSHIP FOR CIVIL JUSTICE FUND
617 Florida Avenue, N.W.
Washington, D.C.  20001
(202) 232-1180

56

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*12,976*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.    This brief document complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2016*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: December 21, 2017                    /s/ Mara E. Verheyden-Hilliard
                                            *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 21st day of December, 2017, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Nicholas S. McConnell
> James N. Markels
> JACKSON & CAMPBELL, P.C.
> 1120 20th Street, N.W.
> South Tower, Third Floor
> Washington, D.C.  20036
> (202) 457-1600
>
> *Counsel for Appellant*

I further certify that, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Mara E. Verheyden-Hilliard
*Counsel for Appellant*